Members of the court, good morning. Assistant U.S. Attorney Mr. Clapper and my co-counsel, I wish good morning, Jane Esch. We're here before the court this morning. My name is Gary Lostico. I represent Kevin Jay Mast on this matter. We have filed briefs covering a number of issues. I'm going to, I'll answer any questions, obviously, that the court would have of me. I'm going to primarily cover two specific issues, as set out in the briefs. So this is a case involving a 1973 U.S. Fish and Wildlife Service easement that did not include a contemporaneous map of what areas were covered by the easement, nor was there any written agreement as to what areas within the parcel were covered by the agreement. Was there what's referred to in Peterson as an easement summary, contemporaneous with this easement? Yes, Your Honor, there was a wetland summary of acreage summary, and Agent Azure with the U.S. Fish and Wildlife Service did testify that what that summary was based on and used for exclusively was as to the value that was going to be paid by the original owners at the time the easement was entered into in 1973, the Volstad, that that did not indicate or control as to what was or was not covered within the easement. It was a valuation matter, and they did the math. That's your argument now, but it's not necessarily. That's our position. Thank you, Your Honor. Yes. But there was no, as in other cases where there's a contemporaneous map which controls, there wasn't in this particular case. There was no indication within the easement of what was covered other than the plain wording, which was. There was no map in Peterson, either. Excuse me? They couldn't find the map in Peterson, either. That is correct. Now, Peterson, at the time that was heard, there had been a great deal of evidence that Peterson had previously been convicted. He knew these, he admitted he knew these areas were covered by the case. In this, there was none of that record before the court as to what was going to be the standard for what those were, what areas would be covered. And the U.S. Supreme Court in North Dakota and this court in Johansson indicated conclusively that is not the entire parcel that's covered. Counsel, you put more emphasis on the prior conviction than I rate in our opinion. Our opinion spent an awful lot of time on the sufficiency of the evidence the government presented without a map. Correct. You want to kind of push that aside and say, well, he had a prior conviction. Well, it wasn't challenged, either. No, there was more than just the conviction, obviously. There was a. What's the difference in the evidence here and in Peterson? Well, the difference in the evidence here is that what the government used to determine what they presented in court over our objection was an aerial photo array that was used in a computer program, which was completed by, we objected to her testimony not being disclosed. Are you talking about the evidence here? The evidence here. My question is, what was in the evidence in Peterson that made it legally sufficient to the district court and our court that the government didn't replicate in this case? Isn't that, isn't I assume you're on the sufficiency issue here? I am, Your Honor. Two issues with that. Well, but that's yet. Well, I know you haven't. I know you have an evidentiary aspect to it, but I'm talking about sufficiency now. And sufficiency was clearly considered and conviction affirmed in Peterson based on a careful discussion of the evidence. The government says we did the same thing here. If that's true, you better move on to another issue. If it's not true, say why. Well, in the Peterson case that the court held, the district court determined, and the Eighth Circuit approved, as I read the case, that there was a signed map and that because of that, Peterson was a stop from denying certain wetland areas because he had previous violations to respect to those areas. You agreed with me that the court opinion says the map couldn't be found. I agree with that, but there was. So it wasn't in evidence. It was not in evidence. I think he, Peterson, acknowledged that there had been a map and he knew that those areas had been identified. Well, I didn't read that. Have you got a site to either the district court or the circuit court opinion? I mean, we don't have the evidence in Peterson in our record. Correct. And I've reserved eight minutes and during that time I will look for the site in Peterson as to this specific question. Frankly, I thought you were going to talk about the photo in Peterson. Well, there was a photo was four years before the easement in Peterson. It was. Aerial photo in this case was 30 years after the year. No, 25. It was. Correct. And the evidence is vastly different. They used an array. That's my question. The evidence is vastly different, Your Honor, than in Peterson. Any other way it was vastly different? At the time, North Dakota and Johansson have determined that they have to specify which specific areas. And in Peterson, that was set out and there was evidence which specified which areas. There wasn't other than the map 30 years after the easement, which was made by Emily Fisher, who they introduced as a expert. She talked about the computer program, her assumptions that she raised, those issues in determining that map in 2010. This was an easement in 1973. It didn't have that map. And there was only one photo, aerial photo, used in the mass case prior to 1973, which showed only one area of surface water. Johansson before or after Peterson? I mean, how does that come into the sufficiency? Johansson was before. Well, so I don't see how you can rely on Johansson to make an argument that was not successful in Peterson. What did Johansson say that wasn't done here? Was that a criminal case? Johansson was a criminal case. And in Johansson, the court also found that it was undisputed that Johansson's ditching drained some wetlands covered by the easement, and Johansson was aware of that. And so in this case, there was only the map from 2010, which was an array of aerial photos that had been all but one taken after 1973. There was testimony at the trial in Mast through Agent Azure and through two drainage contractors that there had been additional water drained onto Mast from properties outside the easement. Those were not naturally occurring. Those were never taken into account by Emily Fisher or anyone with the U.S. Fish and Wildlife Service as they had to the jury of what areas were covered by the easement and therefore which areas had been damaged by the tile. What about the, is it Esty, the biologist's testimony? Didn't he link it up to a pre-1973 assessment of the area? There was only the one aerial photo that was used, and he briefly discussed that and then went on and he testified that... You mean the 2010 photo? Well, there was a 2010 map. What photo do you mean? Esty said in Peterson, as it summarized in our opinion, that he had studied the four year before the easement photo and opined that the wetlands would not have easement of what were the wetlands. And I apologize, I understand. Now you say he relied on a photo, so the photo was taken when? I thought it was contemporaneous with the investigation. It was contemporaneous. In 2010, Fish and Wildlife Service, unrelated to this case, went through aerial photos, determined what they, in their opinion, what areas were covered. And that's what Esty relied on? That's what Esty relied on. And then he opined, in his experience, wetlands don't change much, so it must have been the same in 73. That's what I infer the government's sufficiency argument was. That is correct. Under the Johansson-Peterson standard. Correct. That's what he testified to. Why isn't that, why isn't, if he's a qualified expert, why isn't that a probative opinion that can satisfy the sufficiency requirement? Because the contract required, the easement itself required surface waters or naturally recurring surface waters, which Esty did not look at and did not take into consideration. And he admitted that in his testimony, that he had looked at these photos, most of them well after the easement was entered into. And the 2010 map was an array of those and did not consider the other issues as to the areas on the easement. I don't understand this area like you obviously do. I thought that the easement covered wetlands. And then the obligation of the grantor and then your client by a successor was to maintain those wetlands. And by digging a drainage ditch and tiling, he violated that obligation. So what are you talking about all these details that have to be in the easement other than identifying the specific acres that were wetlands? The easement doesn't identify wetlands as the issue. It identifies surface areas and naturally recurring surface areas within the easement. And they relied on aerial photos, all but one, after the easement was entered into. The only area that showed water. It says small wetland or pothole areas suitable for waterfowl production, right? Well, the easement. That's the language in the easement. Well, the easement stands for itself. It was Exhibit 1 at the trial. And within the controlling language. Did I misread it? I thought that was your brief that emphasized it isn't just wetlands. It has to be those specific, that specific wetland description, which then has to be tied to specific property to get the scope of the obligation under the statute. Correct. I just don't understand your argument. I'm sorry. Try to explain it. Mr. Esty, the biologist that Judge Kelly raised, he had one photo that predated the easement. Is that right? Yes. And then he had later photos over the next 30 or 40 years. Correct. And was his testimony that looking at the whole series, including the one that predated the easement, he could estimate or give an opinion about which areas were covered? Is that the gist of it? That's the gist of it. More precisely said, used the map to justify the areas. The map was what he focused his testimony through. He said that the photos were consistent with the map or vice versa? He relied on Emily Fisher, who did the drawing to create the map. So he did testify that he had looked at some but not all of the aerial photos. He had looked at the map in 2010 and then went back to look at the photos if they matched up with the 2010 map drawing. When was the earliest photo he looked at taken? It was before 1973. I believe it was in the 50s, in the late 50s. One of the briefs says that there was a photo of the property from September of 1972. Do you think that could be right? That could be right, that there was one aerial photo. That's what the government's brief said. My recollection was it was earlier than that. But that was the only one. And that photo showed one wetland area with water, surface water on it. No other indication there was any surface water or that there had previously been any surface water. All the other aerial photos and the ones that showed surface water in addition to Wetland 3 were very recent in years after any subsequent drains that had occurred off site of that property. And we had argued that the Fish and Wildlife should be held to its manual, that they have set out what the standard is, which they did not follow in this case, and which they objected to in the district court did not allow to be presented in evidence. And I'd reserve any other questions or reserve the time. I did, if you would not mind taking a couple minutes, I did wonder about the jury instruction. On the mens rea question. Yes, and that was the other area I was going to address. The instruction, as I understand it, allowed the jury to choose either knowingly or otherwise violated. The government entered a lesser included, sought a lesser included the original instructions for the count. What's your argument? What's wrong with the instruction? The government talks about that it's, that the second lesser included didn't have intentional requirement and then act as if that's a strict liability. And actually in Peterson, which was the lesser included offense charged initially, not knowing. In that particular case, both the district court and the Eighth Circuit approved that there was six elements in the lesser included. In Peterson, which included a knowing. We asked, I asked. Well, how can that be? If the statute says a knowing violation gets one penalty and an otherwise violated gets a lesser penalty, how can the otherwise violated have knowing as an element? Then there would be no difference. That's what they did in Peterson on the lesser included. But didn't it, if you look deeply, didn't Peterson rely on, is it Johansson, which was a case that predated this F1, F2 distinction, correct? I think that is correct. So, so in some, and so I wonder if Johansson was talking about knowing as the statute originally read. And for whatever reason, Peterson adopted that even after it had been divided out. So I guess that calls into question how much we can rely on Peterson for that particular issue. As I read Peterson, it was not a direct issue at Peterson that was raised. All we know from reading the case is that they did require knowing, or they did allow knowing as an element on the lesser included. What was the lesser included in MAS, the F2? Well, what do you think it should be? What do you think the lesser included element is? Well, we argued to the district court as to Kerner, which was a district court case where the court looked at the legislative history, determined one has intentional, one doesn't have an intentional, but there's no indication that Congress explicitly required a strict, or was seeking a strict liability offense. You haven't answered the question. What do you think the element should be? We argued knowingly or other in the alternative that it would be a matter of neglect that Kerner held, that the government had to show that the defendant and Kerner at least negligently allowed his cattle onto the refuge system. That's an answer. You think it's a negligent standard? Is that Kenner? That's what I got. Kenner, yes. Kenner is the case that held that. Unreasonable risk of injury is what I got from your brief. Correct, that it was unreasonable. It didn't mean to stand reasonably. That's your argument? You want us to read negligence into otherwise violated, I think is the argument. Okay, that's all I have. I will reserve my last two and a half minutes. And did the district court explain why that alternative was rejected? The district court just rejected it, did not. And I think based on the reading of the statute, which doesn't have the knowing requirement on the lesser included. Thank you, Mr. Clapper. Morning, your honors. Jeff Clapper on behalf of the United States here this morning, asking the court to affirm the district court's decisions and the verdict in all the issues raised by Mr. Mast. I think what's important. The question I have is under the applicable statutes, does Fish and Wildlife have a civil remedy that would result in an obligation to restore? They probably do. I'm not certain of that. Yes. So and that's basically the criminal penalty imposed here. So we're talking about Fish and Wildlife being able to damage his standing in many ways with a criminal prosecution to get a remedy that they could have gotten with a civil enforcement action. I'm just setting the table here. I understand, your honor. And I will admit this was the first type of case of this nature that I handled. I understand that Fish and Wildlife sometimes can handle or issue citations. To landowners that they find in violation as a petty offense. I'm also aware of cases in our office where we've handled them on a civil matter. But this one in particular, due to the nature of Mr. Mast. Receiving notice from our from Fish and Wildlife after in 2010, that he shouldn't disturb any of the wetlands on his property. And then he went and did it afterwards anyway in 2013. That was the basis for charging him under the knowing provision of the statute. Well, given his reliance on another agency's letter, NCRS. Yes. The USDA, which he has more involvement with than Fish and Wildlife. I think there would be a serious question for the jury. Whether he was unreasonably risking injury. If in fact, he established that he was relying on what was what NCRS. He believed NCRS had said he could do. And I think that's exactly why the jury issued the verdict that they did for the lesser. They didn't have to require anything other than strict liability. Well, they still had to show that there were easements on the property. And that he damaged them. And that those were the wetland areas that were covered by the easement. If he reasonably relied on an NCRS opinion, that what he was doing did not appear to damage the wetlands. And your client convinced the jury. You convinced the jury otherwise. Strict liability says he's a criminal. That's how the statute reads. F-1 and F-2 of 660. The court is very reluctant to have regulatory statutes read that way. I understand that. And so they've said we shouldn't do that. We shouldn't interpret it that way unless there's congressional intent to do so. And I cited in our brief the notes from the Congress. They intended to remove the intent part. We can convict everybody. But then there are elements of Congress who always think that way. And that legislative history, that's looking around for your friends. I'm not sure that the creation of the split offense reflects an intent that the Supreme Court would agree was strict liability. In other words, no men's rail required at all. And yet the district court summarily rejected an alternative that was lesser than knowing. And I'm troubled by that. I understand that, Your Honor. But the district court's job is to accurately instruct the jury on the law. That's how the law reads. There's either a knowing offense or there's all others. That's how it reads. She instructed the jury properly on that. Did she summarily reject the instruction or did she discuss it? I don't remember, Your Honor. I'm sorry. There was a lot of discussion on the instructions because there was more of an issue on the unanimity matter and trying to get that phrased correctly, which she did. You presented this as, well, the jury must have determined that he didn't knowingly do because of this letter from the other agency, but they did find the strict liability crime, as you've described it. Well, if we were to determine that it's not a strict liability crime, the F-2, then in your view, it's not harmless. Is that right? From what you've said? Correct. There's sufficient evidence. Whatever standard the court would create and instruct district courts to give instructions to juries on that lesser offense, there's sufficient evidence to cover that. I thought you said it would not be harmless because you acknowledged that the jury very well must have said he didn't knowingly do it, he didn't have an intention to do this based on this reliance on a letter from another agency in your response to a previous question. So I wondered if you thought then it's not a harmless error problem here. I think it is harmless error based on the evidence in the case that whatever other standard, even under a negligent standard, if the court were to impose that, this evidence would be sufficient to meet that burden as well. Sufficiency is different from harmless. To say it's harmless, we'd have to say any reasonable jury would have found him negligent. If it were a jury question on negligence, then it wouldn't be harmless, but he wouldn't be entitled to an acquittal either. He'd have to be retried. Isn't that right? I think so, Your Honor. Well, did you see any statutes with this bifurcation or the otherwise violates language that have been read to mean negligence or have been read to mean not negligence? Did you find any useful precedent for us on that? I haven't, Your Honor. I read the Kenner case cited by defense, and that was a court that he didn't like it much like Judge Loken did. Yeah, he just says, I'm not comfortable, so I'm going to read it in. But he didn't find any appellate authority in a similar statute? I did not, Your Honor. OK. I wanted to go over the first. What do you think the letter you're talking about from the other agency, what are you saying about that letter that you think? I'm sure that possibly influenced the jury. If you recall the jury instructions, there was an entrapment by estoppel instruction given. That was the defendant's defense, that he basically had authority from some other agency is what he was arguing, that is NRCS. The reason we disputed that, if you read the exhibit in the letter, is even though the letter says you can do this, it still says it's subject to other easements and you need to check with Fish and Wildlife Service before you proceed further. The defendant did not do that. And that's why I say even with a negligent standard, if the court were to impose that, we would, the evidence would support a conviction, even under those circumstances. It would support it, but wouldn't it have to be retried? I'm not sure. I don't know the answer to that, Judge. I'm sorry. I mean, I think the only way it would not have to be retried is if you could say the omission of the element was harmless under Netter and that... I guess it would depend on how the court decided the lesser included offense should be instructed to the jury. And I don't know. All I know is how the court did it, the district court in this case, they removed one of the six elements and made it down to five. And that's what the jury convicted on. And there's sufficient evidence to support that conviction. Now, Mr. Mass received a year of probation, correct? Correct. But if I'm correct, the F-2 carries 180 days in jail? Yes. And a potential fine. He didn't get fined. It's a term of probation that he restore the property. That was his only conditions, other than what he was charged with. Whatever standard probation conditions there might be. And I think there was a $10 special assessment based on the class of misdemeanor that it was. I wanted to touch on the first issue that came up here as to the evidence that came in because I think there's a misconception about what it was. What is important is the statement from Mike Esty that came up is that wetlands areas are persistent over time. Forget the map. Look at the evidence in the case here. And what Mr. Esty testified to is he showed pictures. You're right, Judge Loken, there was one that was six months, less than six months before the easement was entered into. That was September of 1972. Overall, afterward, I had overlooked that one. That puts it much closer to his testimony in Peterson. Yes, within months. But not only that, Mr. Esty testified as to photographs that are exhibit 66 through 70 back as far as 1940, 51, 52, 64, and 1970. And there was also exhibit 51, which was 1956. He looked at all of those prior to the easement. And he showed the jury that evidence of the seven wetland areas on the mass property that had existed consistently and persistently up and through the time of the easement. The map in 2010, that was just a basis of looking at other photographs, many of which were after the easement. But it goes to the same principle. Wetland areas are persistent over time. And it was the same seven areas that were persistent over time. Before, months before, and after. And six of them, because there was one that was very large and he didn't attempt to drain that, but six of them, he did. He put drain tile in and drained the water from them. No, go ahead. Was all of the drainage from the tiles or was it, you just said he drained wetlands. Was that all by this, from this tile project or was the offensive conduct broader than just having the tilers come in? No, it was just the tilers. I understand tile drains. Yes. That was its purpose. And it was effective. The testimony from the tile installers, one was as soon as we hooked it up, you could see water coming out. I mean, it was that effective. And I believe at sentencing, I offered a exhibit. I didn't offer it at trial, but I offered it at sentencing. And I mean, those areas, many of them have been plowed over and planted through. It's been so effective. Speaking of sentencing, could you address the issue of the restitution for the restoration of the land? It seems to dovetail with the unanimity instruction that the parties agreed to. How do you link that? If the jury does just have to agree unanimously on one wetland area and yet the restoration award, as I understand it, and you can tell me if I'm wrong, is for the entire parcel. How does that link? You're correct, Judge. The restoration order was for the entire parcel. So for all six affected wetland areas. And as I understand the law, the court can order that as it relates to the conviction. So this conviction was for disturbing and violating the statute, disturbing the federal government's property interests. So you think that stays within the Huey boundaries for that restitution is limited to the offense of conviction? Yes, unless otherwise agreed to by the parties, which I often do in plea agreements. But in this case, since we're relying on a jury verdict, the offense of conviction. Suppose if we had multiple easements on adjacent parcels and it was only charged with one, and the restitution order was restore them all, then you'd certainly have a Huey problem. I agree. But this all were on the one tract of land. But what about the fact that we don't know whether the jury found that he disturbed one or all six? Do you think the court can then make a finding that he disturbed all six, even though we don't know what the jury did on? Yes. There's no Sixth Amendment problem with that? Well, I don't believe there is one. And the defense hasn't pointed one out either, Your Honor. I'd liken it to many of the cases that I deal with in the child pornography world. The jury can convict of one, even though the defendant has a thousand. The court takes notice of the evidence presented at trial and makes a sentencing decision based on that evidence, not on the jury's finding. Well, that's for the guidelines, though. That's not a restitution issue. That's true. I agree with that. In this case, there's evidence. The same thing happened to all six affected wetland areas. The exact same thing. There's no difference. But the question is whether you needed to get a verdict on all six in order to get restitution for all six, or whether you can get an ambiguous verdict that was one or more, and then get restitution for all six. Right. So in this particular case, since they were all instructed properly on the unanimity instruction that they all had to agree on at least one, there was no request by defendants to specify which one. And the court is the same court that sentenced him that sat through all the trial would support that evidence. How does the restoration work? Given this parcel of land, is it practical to say you could restore one wetland area and not another, or are they connected in some way? If you look at the map in the brief that we provided, areas one and two are connected. That's kind of a separate drainage system. And then the four, five, six, and seven, those are all connected. So it's really two separate areas. So could you, as a practical matter, go in and restore five and just alone, and leave six and seven alone, even though they're connected? Some you could, and some you could not. Because they are in a continuation of the same drain tile line that then exit out of the property. So the ones upstream, if you will, or up the line, could be. But you couldn't just do the bottom one, because the ones up line drain into that. Refresh me on the jury's required role in restitution. I thought, I'm not sure, is there a right to a jury trial for restitution? Not that I'm aware of, Your Honor. No other questions. My time's about up. I thank you, and again, ask for affirmance on all the issues. Thank you, Your Honor. Mr. Lastico for rebuttal. Thank you, Your Honor. Judge Loken, as to Peterson, as to the facts in Peterson, there was a map signed based on the district court opinion that Peterson did, he did not own the property originally. He farmed it. There's a dispute over what areas were covered by the easement. It was renegotiated between Peterson and Fish and Wildlife. He later then purchased the property. And then the evidence showed that he then impacted, injured those wetland areas with drainage activity after that renegotiated map. So they found that was sufficient evidence. There wasn't a mass case. He had never talked with Fish and Wildlife. He wasn't aware about the 2010 map that was presented at any time through the process until he started working with the NRCS office with the USDA. They said, go to Fish and Wildlife. He went to Fish and Wildlife. USDA said, we're not going to act on your request to drain until it gets straightened out with Fish and Wildlife. He heard nothing else. He received the approval letter from the NRCS that he could drain. And he went out and drained, subject to the limitations in that under the manual and the guidelines as required for the USDA to follow under the Food Security Act regulations. And we do disagree with the government as to the restitution. In this case, with the unanimity issue with the instructions, all we know is that the Well, what case says that that was a jury issue? As to restitution, once the jury finds unanimously that at least one parcel was? We've cited cases that the court can't order restitution unless it stems from the actual conviction that the jury found. That's the Huey principle. But what's the jury's role in applying that? I just asked for a case that the government said it wasn't. Council says it's not aware of one. I wanted to know if you were. I'm not aware that there's a case that requires the jury to make a restitution decision. Just that the court cannot order restitution that doesn't follow from a specific finding of guilt by the jury. Well, they did find him guilty. They found him guilty under the instructions which were to the jury. You need to find at least one. You need to find at least one. And the requirement is that he had to restore all six. And they could each and every wetland on the property be restored individually. It's not a two and five. It's each one would be different. There's no other questions. Thank you. Very good. Thank you, counsel. Case is interesting and complicated. And it's been well briefed and argued. We'll take it under advisement. Thank you.